Okay, Ms. Keller. Ms. Keller May it please the court. My name is Kim Keller. I'm court appointed to counsel for Mr. Sanders. I'm sharing time today with counsel for Mrs. Rose. This was a three-week trial, 24 witnesses, 10,000 documents, but I'd like to talk today about one witness, Blanca Ramirez. The reason I'd like to talk about Blanca Ramirez is because of how she came to testify before the jury. It is Mr. Sanders' contention that the prosecution placed their desire to have this witness testify over the constitutional and statutory rights of Mr. Sanders. Who is Blanca Ramirez and why is she important in this length of a trial? That was the first question I had. Why does one witness matter? Well, when we look at the government's theory of the case, the government took those three weeks and what they did was they pointed out all of the bad conduct and bad behavior of Mr. Rose and imputed those behaviors onto Mr. Sanders, my client. Mr. Rose was the one throughout the record that was berating his employees, cursing at his employees, pretty much forcing his employees to fraudulently enter records, to fraudulently provide therapy to clients, and because of those scenarios, these employees either quit or were fired if they complained. Blanca Ramirez— Well, there were also witnesses who testified that Mr. Sanders talked to caregivers, told them they should use the so-called cheat sheet and bill for the maximum amount that was permitted, whether they did the services or not. I mean, there was a lot of evidence about Sanders' involvement also. Yes, Your Honor, and in fact, that's why I didn't want to take the Court's time today to argue the sufficiency point, because I do believe the sufficiency point is the weaker of our points. But I do have to address the rest of the evidence because of the harm element of the ex parte communication issue. And the reason I think the harm element is met in this case is because when you look at what the other witnesses testified about, how they directly connected Mr. Sanders, whether you listened to the witnesses, how much credibility you gave those witnesses, it was Ms. Ramirez that told a story about having an immigration issue. She said she was not allowed to work in the United States legally, but she was hired to do the things that were wrong. He berated her, he made her cry, and then when she continued to complain, she was fired. Why did that matter? Well, we have to understand what the government's theory of the case was. And when you look at the Ganji case, and this is a case that we cited in the sufficiency part of the argument, the Court has two different scenarios to look at in how these types of In the Ganji case, this type of evidence, the evidence that was relied upon by the government, where it was the caregivers, the boots on the ground employees that were actually marking down the records, filling out the records, that Let me better understand your argument about Ramirez. What part are you arguing about her? Is it the ex parte communication or the quality of her testimony or what? Yes, Your Honor. And I apologize, I might have jumped the gun to just assume that the Court would find the ex parte communication a violation. Let me first address why I think the ex parte communication was a violation. If the Court, and the government did a very lengthy brief and really gave a good summary of the record. This is a 30, I don't remember how many pages of the record, but this is a 180 page brief that summarizes what each witness testified about. On page 126 of the government's brief, they quote the transcript where this ex parte communication was talked about. And what we do know and what we don't know are the two reasons why I think there was a violation. Here's what we do know. On day four of trial, the government figured out, was told, was informed that there was a witness that was supposed to testify the next day that didn't want to testify anymore. The government did not, the government then contacted the court coordinator, didn't notify Mr. Sanders' counsel about this. What ended up happening, that we're piecing together from the gaps in the record, is that the trial court was put into a very unusual position and the trial judge, I think, did the best he could with the position he was put into by the prosecution. But what happened was, throughout the rest of the next day, no notice was given to Mr. Sanders' counsel. That there was an ex parte communication that had taken place with the court the night before, that the witness that didn't want to testify beforehand had been called into the trial chambers, that the trial judge had a conversation with this witness, and that the trial judge had decided to say some things to the witness that could be construed as possibly persuading the witness to testify when she didn't want to. Some of the language that the trial judge used, or that he tried to remember using, because remember, there wasn't a court reporter in the chamber, so he was trying to remember in the middle of this trial what all had happened. What's the bottom line? Is it that the defense counsel didn't get prior notice, wasn't, you know, there, etc.? I mean, since you're putting a lot of weight on that. Is that the cut line, that they were prejudiced? Yes. Yes. I think we overcome the burden of proving a violation under the case law that we cited, where I think we need to convince this court is on the prejudice aspect of it. See, what I didn't understand, you were mentioning Ramirez, and then you mentioned Ganji, and I understand the grieving on Ganji unsuffices it, but I didn't understand the link between your arguing about Ramirez and Ganji, because Ganji didn't have this issue in it. That's the part I was missing, but I understand you're arguing prejudice on the ex-partner. Okay. And the only reason I brought up Ganji, Your Honor, is to show the two different types of ways that the prosecution tries to prove these kinds of cases. And when the government has tried to prove their case in this manner, that took place in this case, there are times where the court decides that's insufficient evidence. And so Blanca Ramirez's testimony was crucial to the government, and it knew that. If the government had 23 other witnesses, why did it violate Mr. Sanders' rights to make sure Blanca Ramirez showed up the next day? And why did it hold and hide the information about the ex-parte communication? The night before, the next morning, nothing was said. At the lunch break, nothing was said. The only reason Mr. Sanders knew that this happened was because the trial court on its own, sua sponte, right before Ms. Ramirez was called to testify, said, I just want to put something on the record of what happened last night, and that's where page 126 of the court said. But if it's true that the evidence is overwhelming and the government did not need Ms. Ramirez, why the trampling of the rights of Mr. Sanders to make sure she testified? I think, I'm only the appellate lawyer, I wasn't present during the trial, but when I read the black and white papers, the story she told was very powerful. And I think that made a difference to the jury. And I think that's why the government wanted her to testify. And when those actions were imputed on to Mr. Sanders, I think it made the difference. Because remember, in this case, there were four defendants. One defendant was acquitted of all charges. He was someone that was in a similar situation to Mr. Sanders. Your initial time has expired and you've saved time for rebuttal, Ms. Keller. Mr. Garmon? May it please the court, my name is Yolanda Garmon and I represent Ms. Pamela Annette Rose in this matter. At the outset, I would like to say to the court that this is not a typical health care fraud case. Ms. Rose's position is unique. The record evidence bears out that Ms. Rose is suffering and was at the time of trial and at the time of the allegations alleged here in this case, suffering from a debilitating, excruciating disease. She's suffering from spinal cancer. The record evidence and testimony shows that Ms. Rose could barely work two or three hours a day. And when she did work most of the time, she did that work in constant pain from her bed at home. Ms. Rose, an intelligent woman with numbers, the evidence will show Mr. Cruz testified that her position with the company was not necessarily having a physical presence at the company every day, but she did, being gifted and trained in numbers, do number crunching for the business. Tell us what the record reflects about the day the warrants were served and Ms. Rose either contacted or went to the bank for an immediate transfer of substantial amounts of funds from one account to the other. Ms. Rose went to the bank to transfer funds from one account to the other. And there is a statement. That was, I don't mean to interrupt you, you have plenty of time to answer, but that was immediately after the warrants were served, is that right? Yes, Your Honor. And Mr. Cruz' testimony on that point, it says that she transferred the money, but she transferred the money not knowing that any monies transferred were going to be the product of illegal proceeds. And that's one of the elements that has to be met here to sustain the conviction. We know in criminal law . . . Was there anything in the record that she said that the transfer, she needed to transfer so that the government wouldn't know what's going on? Those are my words, but . . . She transferred the money, not . . . Was there anything like that? No, sir. There is a line in that that she transferred the money so that the government could not seize the money immediately, not because they didn't know. Everything that was done in terms of financial transactions as it relates to the business was not something that could be hidden. It was done through bank transfers, through checks, and through transactions that could be tracked through the bank. So the evidence does not show that it was her intention to hide the money from the government because it was a product of illegal proceeds, but it was her intention to take the money because the money was needed at the time because she had been noticed that perhaps some of the funds available to them would not be available. So she was going to take some money for living expenses. But in criminal jurisprudence, we know that evidence of intent is what takes place before a crime and after a crime. What was the amount of the transfer that we've been talking about, approximately? I don't recall the amount of the transfer right off of my head. It may have been $50,000. You're talking about the one transfer to buy the lot? Yes, sir. Because it was like $900,000 total. $900,000. So she transferred the money to take care of living expenses. But after she transferred the money and became aware, yes, $190,000. After she transferred the money and became aware that that was not the proper thing to do, the record evidence shows that she did put the money back into the accounts. So it was never her intention to take money from illegal proceeds. Did Ms. Rose testify at trial? No, sir. She testified at the forfeiture proceeding. But that does bring me to my next point, Your Honor. As co-counsel said, there were 24 witnesses and 10,000 documents in this case. There's not one single witness. We assume that when the government prosecutes a case of this magnitude, with 24 witnesses, 10,000 documents, and this many days at trial, nearly a month, that they are putting forth their best evidence. And if the record that we have before us is the best evidence of Ms. Rose's criminal intent, then the evidence fails miserably. Of the 24 witnesses produced at trial, we do not have one witness that can attribute any criminal intent to Ms. Rose. As a matter of fact, even the special agents in this case that were assigned to do the investigation testified at trial that they could not link Ms. Rose to any criminal intent in this case. A computer analysis testified she did not impute any criminal intent to Ms. Rose. J. Mariana, a chief financial officer for Workman's Comp, did not impute any intent to Ms. Rose. There was Mr. Cruz, who was a very important witness at trial, because the one piece of evidence that the government makes a big to-do about is an executive meeting, a conversation here. And Mr. Cruz was a part of that meeting. The government's brief, it takes blurbs and excerpts of the meeting out of context in an attempt to impute criminal intent or knowledge to Ms. Rose. But Mr. Cruz... Did Dr. Smith testify that she pressured Dr. Smith to use the cheat sheet and bill the maximum allowed by the regulations? No, Your Honor. Dr. Smith did not testify to that regarding Ms. Rose. I believe she testified to that regarding Mr. Hynie or Mr. Sanders. So, and didn't Dr. Smith say that Ms. Rose knew that there was not a one-on-one treatment like the bill reflected? I don't believe Dr. Smith said that as to Ms. Rose. I believe her testimony was as to Frankie Sanders and Mr. Rose and Dr. Hynie. There are three witnesses in this case, Dr. Smith and two other doctors, Dr. Hawkins and Hoffman, who say that Ms. Rose had no input whatsoever into the day-to-day billing activities or treatment activities of the business. The doctors testified that they took their orders, their direction, and any instructions regarding notes or billing from Dr. Hynie. As a matter of fact, Dr. Stoler testified that she noticed and discussed the inadequate of billing codes with Dr. Hynie. With respect to the billing, the chiropractic treatment, the failure to have one-on-one treatment, three witnesses implicate Dr. Hynie. That's an interesting fact here. I'm sorry my time has expired. Yes, you're an issue. That's an interesting... Your time has expired and you've saved time for a bubble. Thank you. Thank you. Ms. Elanese? May it please the Court. Amy Elanese for the United States. I'd like to jump into the discussion about the ex parte communication issue. What happened was after court had ended today, testimony had ended, apparently the defendants and their counsel had left the courthouse. The prosecutors were still there working on the case and it came to their attention that this one witness, Ms. Blanca Ramirez, basically said that she was not going to obey the subpoena that they had for her presence and she was not going to show up to testify tomorrow as scheduled. And so the prosecutors began the process of seeking a bench warrant to ensure her presence the next day. And when they went to speak to the court coordinator, Judge Werlein, he learned that they wanted a bench warrant and he was understandably reluctant to take such a draconian step. So he chose to talk to Ms. Ramirez in his chambers. The prosecutors were not present. And he disclosed the content of that discussion the next day in open court to everyone. And basically he said, he told her what would happen if she did not voluntarily comply with the subpoena. A bench warrant would be issued and it would be ugly. And I think we can all agree that would be ugly. And then Ms. Ramirez decided that she would voluntarily comply with the subpoena that she was already under. As far as the defendant's arguments, there's really no showing by them that this administrative matter of, you know, it wasn't about Ms. Ramirez's testimony. Judge Werlein said, we never talked about her testimony. I don't know what it's going to be. It wasn't about whether she was going to be at the courthouse to testify. It was merely about how her presence was going to be accomplished. Whether by her voluntary compliance with the subpoena or by the issuance of a bench warrant. That's all it was about. So they really haven't shown that this administrative matter is even covered by Rule 43. They haven't shown, in other words, that it's a stage of the proceedings at which a defendant and his counsel are entitled to be present. But, even if you assume that Rule 43 applies, they can't show any harm here. Now, they have both talked about Ms. Ramirez. She testified about the shenanigans that were going on in these clinics, about how the patients just showed up and worked on a treadmill, used gym equipment by themselves. And she also testified about how she told one patient that, well, ma'am, I can't write down that you do all this stuff because you didn't. And the patient got very angry, went to Mr. Rose, and he yelled at Ms. Ramirez and upset her, and she ended up quitting the job because she felt she hadn't done anything wrong. The problem with that argument for the defendants is we had a bunch of other of those technicians that testified essentially to the same thing, that there was all this, that no 101 physical therapy was being done, the amounts of therapy was being falsified on the claims, and some of them also testified about, well, I spoke up and I said, wait a minute, these people aren't doing what they're supposed to do, and they were told either by Mr. Rose or Dr. Jaime, you know, just leave it alone. You know, do what they, just let them do what they want. They're paying clients. You know, we don't care. Just fill things out according to that cheat sheet. So there's really nothing in Ms. Ramirez's testimony that was all that especially damning. If there are no questions about that, I will move on to the sufficiency of the evidence. I think Sandra's counsel has more or less conceded that the evidence is sufficient to support his convictions, but let me talk about Mrs. Rose. Her main argument is, well, the government didn't put on any witnesses that showed up there and said, yes, you know, Mrs. Rose has criminal intent, and this is why I think that. As we know, criminal intent... I heard the main argument being that she was suffering from spinal cancer and did most of the work, any work that she did from home, and I infer from that the argument is that she really wasn't on the job physically present very much. At least that's part of the argument. She did apparently suffer from some kind of cancer and had some problems with mobility. She may have worked at home some, but she was at the office plenty. I've laid out in my brief all the duties that she had. One of her duties, for example, was making sure everybody was properly licensed and qualified. You know, she certainly knew that there were no licensed physical therapists as the clinics all touted in their advertisement. She controlled the billing. I'm sorry, she controlled the finances. That was her title. She was very involved in everything. You know, she did meet with Dr. Smith in the process of an evaluation, and she basically told Dr. Smith, well, your evaluation next year and your pay is gonna depend on how much you bill. And she and Mr. Rose both pressured Dr. Smith at that meeting and also in some other e-mails and stuff. Dr. Smith was constantly being pestered to follow the cheat sheets, maximize the billing, and Mrs. Rose was very involved in that. She was... Were almost all the services this clinic provided chiropractic services and physical therapy? Jez, they really weren't providing any valid services to anyone. The chiropractor at each clinic was the one who was signing off. But the chiropractor never did any one-on-one treatment with anybody. There was no real physical therapy. If you've ever had that, you know you work intensely with one therapist and they monitor everything you do and make sure you do it correctly. None of that happened. They basically were hiring these people off the streets. Some of them had worked at the GAP. Some of them were security guards. One of them worked at a funeral home. They had no training whatsoever. And their job was basically to do things like e-stem on the patients, which is a little electrical stimulation machine, and run them a little massage wand over people. They had no training in that either. Was she interviewing them? The brief said she was evaluating these doctors and telling them that, you know, everything was tied to profit, etc. So in the recruiting of the doctors, the chiropractors, whoever they were, was this being done in the office at the clinic where she was? People being summoned in, and this was the way the evaluation occurred that the government alleged? I believe Judge Smith's evaluation occurred in the office of the Federal Work Ready North, where she was the chiropractor. I think all the interviews happened in the offices. I know that she apparently was in on the interview of Dr. Hyman when he was hired, and we know that she and Mr. Rose met with John Cruz. I think that occurred at a restaurant outside the office, but she was certainly key in convincing him to come work for them. Among the witnesses that the government put on, indirect or otherwise, were the witnesses who testified from their personal knowledge about the level and quality of Ms. Rose ' activity, involvement, with regard to what the government charged? Do you understand what I'm asking? I'm sorry. Were there witnesses who testified, I don't know if the case agent or somebody else who could testify from their own knowledge about Ms. Rose' involvement, all that the government alleged, who actually were able to tell the jury what her actions were, when, etc., what the government alleged about telling doctors this is tied to profit, the transfer of the money, and the whole shield? Yes, Judge. Dr. Smith testified about that evaluation that Ms. Rose participated in. There was testimony, John Cruz testified about the transfers. When the search warrant came down, Ms. Rose called him and said, get over there, and then after he returned and went to meet, or called her, I guess he called her after he got out of the office and told her what was going on, Ms. Rose immediately said, meet us over at Chase Bank. And then, of course, when they all arrived, Mr. and Mrs. Rose and another employee named Amanda Taylor went in the back, and there were actually 12 different transfers out of 12 different federal work-ready business accounts amounting to almost $700,000 that day. And then, of course, the next day they were transferred to the Pure Vanity account, which had been conveniently incorporated by Mrs. Rose just a few weeks earlier. And, of course, that's the account from which the real property was purchased. That was the subject of the forfeiture. So, yes, Judge Stewart, there was evidence of her direct involvement in these matters. Did the clinics have MDs on staff, or was it strictly chiropractors or alleged chiropractors and physical therapists? They did have two doctors that I recall being involved in this during the conspiracy. One was Dr. Key. He was an older, retired military surgeon, and he had tremors. Several witnesses commented on that. In fact, one of the patients said that it had been recommended that Dr. Key perform a surgery on her carpal tunnel, and she refused because she thought uh-uh, his hands are trembling, and so no, I'm not even going to do that. Then there was another doctor called Dr. Train, who apparently was old and forgetful, as one witness characterized him. And Dr. Jaime and the other chiropractors were instructed by Sanders and Mr. Rose to correct their medical reports, basically to aim it at what they wanted to bill for. So yes, there were doctors on staff, but they weren't really participating other than to sign off. Did you say a minute ago that there were no licensed physical therapists? There were no licensed physical therapists that ever worked at any of these clinics. They just had these mostly young women they hired with no experience whatsoever. And briefly, I just want to touch on the forfeiture issue. I think I've laid it out pretty well in my brief. At the forfeiture hearing, Mrs. Rose did testify, and she talked about a check that she had received from some other source that she claimed had nothing to do with any of these clinics. Our agent went meticulously through all the records and she used a recognized accounting method called First In, First Out, and she testified that there were approximately $48,000 of the proceeds from the transfer of monies right after the search warrant was served and that under the First In, First Out principle, the $27,000 plus dollar cashier's check was purchased with those criminal proceeds. You said 90% of the money came from the federal compensation? Oh, at least. I think that's a low conservative estimate. But wasn't that her testimony? It was. And basically these clinics could not have existed without this Department of Labor FICA fraud. So what about the, I mean there were some say there was approximately 10% was untainted money. How does that figure into the forfeiture? Well Judge, there are some cases which I discussed in my brief that say when the business enterprise is basically primarily and really even completely a vehicle for fraud then anything that may have been quote legitimate is considered indirect proceeds because this whole, this clinic and all of this would not have been able to exist without the Department of Labor FICA fraud that went on. Do you have a case that says that? I've got it cited in my brief and they're not exactly in the same context. I can't find any cases that were in this exact context but you know, you look at the case called Hoffman Vale out of the 11th Circuit and they talked about, and it was a case where this provider had some funds also from private insurance companies and they said that's still gross proceeds because but for the Medicare fraud she would not have been able to collect those sums from those other insurance companies. Do we have a case? Well the closest one I found was called the United States versus Melrose East Subdivision and it was in a different procedural posture because what was at issue there was a pretrial restraint of assets and that's a totally different standard that requires showing a probable cause. In a forfeiture matter, the standard is preponderance and basically in that case they were restraining some real estate that had been purchased and the district court looked at all the evidence and they noted that before the purchase of those lots, this company had experienced a huge spike in these government insurance they said it was okay for the district court to infer in that case that this real estate was purchased with so and then there is another case called Smith out of the Sixth Circuit basically they found that where fraud touches everything related to the company that's at the center of the fraud then you can assume the proceeds are either direct or indirect criminal proceeds. So those are my best cases if there are no further questions What was the amount of the fraudulent proceeds? The entire fraudulent I think the restitution amount was over 14 million dollars and that this case only concerned I think 8 of the clinics they had some other clinics so there was some relevant conduct that came in as well but the total is over 14 million dollars is the amount of the fraud Thank you Ms. Nolanese Ms. Keller May it please the court quickly just to clarify Mr. Sanders is not conceding the sufficiency point There's 30 pages of briefing on why the evidence is insufficient in the short amount of time we have with the court I decided to focus on an issue that I thought was important and that wasn't reflected in the briefing and the reason I decided to focus on that point is because You haven't waived anything The only other thing I'd like to point out is Ms. Ramirez's testimony was the only testimony that gave a powerful emotional story about how the employees were treated and when the court looks at the Ganji case which is a sufficiency case but shows how the government typically proves up these cases it'll see the difference of how that case without those types of stories turned out to be insufficient evidence of concerted action conspiracy cases. Thank you your honor unless the court has any other questions I'll give my one minute back Thank you Ms. Keller and we noticed that your court appointed we appreciate your willingness to take the appointment and also appreciate the good work for your client Thank you your honor Ms. Jarman As to the proceeds issue in the record defense counsel asked Agent Tan can you tell the ladies and gentlemen of the jury what percentage of the 9.6 million was covered by over billing Agent Tan responds I did not place that in my analysis again my analysis only showed how much they received from the Department of Labor so in all fairness you don't have that figure and Agent Tan responds no and as to the sufficiency issue Jay Mariani the government's witness for the Federal Employee Compensation Department says as to Ms. Rose's position and her role in the company with respect to the policies and procedures that she was to adhere to she did nothing wrong every witness testified that Mr. Rose was at the top of the corporation Mr. Sanders did the billing and Dr. Heine directed the doctors there is evidence that Ms. Rose conducted employee evaluations but again that's not a crime she was concerned about profits and spending she was conservative in spending every business owner is concerned about profits at the end of the day on some of the sufficiency questions the government answered I guess, I believe I guess and I believe it's not enough to incarcerate a woman for 10 years suffering in Ms. Rose's condition so we're asking this court Let's get back to the question of the transfer of funds immediately after the warrants Ms. Alanis indicated that those transfers amounted to about $700,000 and you indicated to us that the transfers were for living expenses. Would you address that? The way I address that, Your Honor is that for the transfers to be illegal, Ms. Rose would have had to have been participating in those transfers to hide money that she knew That wasn't the question. Listen carefully to my question. I'm referring to what Ms. Alanis told us she indicated two things one that the total amount transferred was about $700,000 and then you told us that the transfers were for living expenses. It seems to me that those two things don't match up very well. $700,000 would not be in my world for living expenses It would not be So it wasn't just for living expenses There's no testimony in the record of what that money was for. There's just testimony that she put the money back So where did you get the idea that it was for living expenses? Because I was confusing the $700,000 with a $25,000 figure which actually when I went back and sat down refers to a check that relates to some property in the record That's a fair answer Thank you Mr. Chairman Your case is under submission